IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

WILDEARTH GUARDIANS,
SIERRA CLUB,
CENTER FOR BIOLOGICAL DIVERSITY,
and,
HIGH COUNTRY CONSERVATION ADVOCATES,

      Plaintiffs,

v.

MOUNTAIN COAL COMPANY, and
ARCH COAL INC.,

      Defendants.

_____

# COMPLAINT

_____

## INTRODUCTION

1.     This is a citizen enforcement suit brought by non-profit organizations, on behalf of their members, against Defendants Mountain Coal Company (Mountain Coal) and Arch Coal Inc. (Arch) for violating the Clean Air Act at their West Elk coal mine (Mine) located in Gunnison County, Colorado.  Defendants Mountain Coal and Arch have failed to obtain two air pollution permits required for the Mine—a construction permit and an operating permit. Without the proper permits that impose mandatory and enforceable emission limits and other requirements, Mountain Coal and Arch are unlawfully emitting volatile organic compounds (VOCs) and illegally constructing and operating the Mine.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action under 42 U.S.C. § 7604(a)(1) & (a)(3) (Clean Air Act citizen suit provision) and 28 U.S.C. § 1331.

3.      On December 17, 2019, Plaintiffs sent a letter (the "Notice Letter") by certified mail, return receipt requested, to John Eaves, Chief Executive Officer of Arch, and to Weston Norris, General Manager, and John Poulos, Manager of Engineering and Environmental Affairs of Mountain Coal.  A copy of the Notice Letter is attached as Exhibit 1 and is incorporated by reference herein.  The Notice Letter stated Plaintiffs' intent to sue Mountain Coal and Arch for Clean Air Act violations.  Mr. Eaves and Mr. Poulos received the Notice Letter on December 24, 2019 and December 27, 2019 respectively.

4.      On December 17, 2019, Plaintiffs sent a copy of the Notice Letter by certified mail, return receipt requested, to Andrew Wheeler, Administrator of the U.S. Environmental Protection Agency (EPA); Gregory Sopkin, Region 8 Administrator of EPA; the U.S. Attorney General William Barr; Colorado Governor Jared Polis; Jill Hunsaker Ryan, Executive Director of the Colorado Department of Public Health and Environment (CDPHE); and Gary Kaufman, CDPHE's Director of the Air Pollution Control Division.  All of the persons named in this paragraph received a copy of the Notice Letter no later than December 26, 2019.  On January 3, 2020, Plaintiffs sent a copy of the Notice Letter by certified mail, return receipt requested, to CT Corporation, the registered agent for Mountain Coal and Arch in Colorado.  CT Corporation received copies of the Notice Letter on January 6, 2020.

5.      The Notice Letter satisfies the pre-suit notice requirements of the Clean Air Act, as set forth in 42 U.S.C. § 7604(b) and 40 C.F.R. §§ 54.2, 54.3, to the extent one is required. More than sixty days have passed since the Notice Letter was mailed to and received by the recipients listed in paragraphs 3 and 4.

6.      As of the date of the filing of this Complaint, neither the EPA nor the State of Colorado has commenced and is diligently prosecuting a civil action in federal or state court to

enforce the Clean Air Act violations that Plaintiffs are alleging.  Neither EPA nor the State of Colorado has taken regulatory action sufficient to remedy Mountain Coal and Arch's violations or order Mountain Coal and Arch to cease construction and operations at the Mine until permits are issued.  Mountain Coal and Arch's violations have been repeated and Mountain Coal and Arch continue to violate the Clean Air Act.  At or around the time this Complaint was filed, Plaintiffs served a copy of it on the U.S. Attorney General and the Administrator of EPA, pursuant to 42 U.S.C. § 7604(c).

7.      The relief requested is authorized by 28 U.S.C. §§ 2201(a), 2202, and 42 U.S.C. § 7604(a), (d), and (g).

8.      Venue is proper in the District Court for the District of Colorado pursuant to 42 U.S.C. § 7604(c) and 28 U.S.C. § 1331.  Plaintiffs have offices and members in Colorado.  The Mine and Mountain Coal's offices are located in Colorado.  The complained-of emissions are occurring in Colorado.

## PARTIES

I.      <u>PLAINTIFFS</u>

9.      Plaintiff WildEarth Guardians is a non-profit membership organization with offices in Denver, Colorado.  WildEarth Guardians has approximately 4,000 members in the United States, many who live in Colorado and others who regularly recreate, visit, or work in Colorado and the areas affected by the Mine.  WildEarth Guardians' mission is to bring people, science, and the law together in defense of the American West's air quality, rivers, forests, deserts, grasslands, and the delicate web of life to which we are inexplicably linked. WildEarth Guardians, its staff, and members work to protect and enhance the quality of air throughout Colorado and the United States as a whole.

10.     Plaintiff Sierra Club is America's largest grassroots environmental organization, with more than 830,000 members nationwide, including more than 24,000 members in Colorado.  The Sierra Club is dedicated to the enjoyment and protection of the Earth's wild places; to ensuring we can breathe clean air so that healthy communities and wild places thrive; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.

11.     Plaintiff Center for Biological Diversity (Center) is a non-profit environmental organization with over 69,500 members, many of whom live and recreate in Colorado, including the areas affected by the Mine.  The Center is headquartered in Tucson, Arizona, with offices in a number of states and Mexico, including in Denver and Crested Butte, Colorado.  The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, air and water quality, and public health through science, policy, and environmental law.  The Center's efforts to protect critical ecological and biological values include work on facilities, like the Mine, that contribute to climate change and adversely impact air quality.  Based on the understanding that the health and vigor of human societies and the integrity and wildness of the natural environmental are closely linked, the Center is working to secure a future for animals and plants hovering on the brink of extinction, for the ecosystems they need to survive, and for a healthy, livable future for all of us.

12.     Plaintiff High Country Conservation Advocates (HCCA) is a non-profit conservation organization headquartered in Crested Butte, Colorado.  Founded in 1977 to keep Mount Emmons' molybdenum mine-free, the group's work now addresses other issues that affect Gunnison County's clean air, clean water, public lands, and healthy wildlife.  HCCA has

about 900 members who live, recreate, and enjoy the rural and wild character of Gunnison County and the surrounding public lands.

13.     Each Plaintiff-organization is a "person" within the meaning of the Clean Air Act's citizen suit provision. 42 U.S.C. §§ 7604(a); 7602(e).

14.     To fulfill their respective missions, goals, and purposes, Plaintiff-organizations have worked, and continue to work, to stop and limit the Mine, its unhealthy air pollution, its contribution to climate change, and its adverse impacts to Colorado's natural environment. These organizations have attempted to ensure Mountain Coal and Arch comply fully with environmental laws, including the Clean Air Act, and reduce emissions of VOCs and methane. The interests that Plaintiffs seek to protect through this lawsuit are germane to their missions, goals, and purposes.  Individual members are not needed to pursue claims under the Clean Air Act or secure requested remedies.

15.     Plaintiffs' members enjoy and conduct activities on the lands where the Mine is located, within view of the Mine, and within areas adverse impacted by the Mine, including the areas harmed by the Mine's VOC and methane emissions.  Members live near the areas adversely affected by the Mine and its air emissions and intend to return to these areas on regular and recurring bases.  For example, members use and enjoy the West Elk and Raggeds Wilderness Areas, the Sunset, Pilot Knob, and Flatirons Roadless Areas, the Grand Mesa-Uncompahgre-Gunnison National Forest, Colorado State Highway 133 and Colorado Route 12 (Kebler Pass Road), the towns of Crested Butte and Gunnison, and the towns, farms, and orchards within the valley of the North Fork of the Gunnison River.  Members regularly use these areas for: viewing and tracking wildlife, birds, wildflowers, vegetation and big trees including quaking aspens and fall foliage; scaling mountain peaks; skiing; camping and

backpacking; photography; hiking; fishing; hunting; swimming; biking; running; gardening and raising crops; and aesthetic appreciation of the area's natural beauty, wild values, and solitude. The construction, operation, and presence of the Mine and its infrastructure mar the scenic beauty of the area, reduce the sense of solitude and quiet in the nearby and adjacent wilderness and roadless areas, and lessen the likelihood of viewing wildlife. The Mine harms Plaintiffs-members' recreational interests and aesthetic values found in the area impacted by the Mine.

16.     The Mine and its emissions of air pollutants contribute to a reduction in air quality in the region. The Mine emits air pollutants that contribute to the formation of ground-level ozone. Ozone at ground level is itself a harmful pollutant because of its effects on people and the environment, and is the main ingredient in smog. https://www.epa.gov/ground-level-ozone-/ground-level-ozone-basics.

17.     Breathing ozone pollution causes health concerns, especially for the elderly, children, people with asthma and other respiratory problems, and those who are active outdoors. VOC emissions can cause lung irritation. Plaintiffs' members are exposed to and suffer from elevated, unhealthy levels of ozone pollution from the Mine's VOC emissions. The Mine's ozone pollution (including emission of VOCs) detracts from members' use and enjoyment of recreational areas near the Mine and other impacted areas and makes Plaintiffs' members concerned for their health. Plaintiffs' members have experienced symptoms associated with breathing ozone in areas affected by the Mine's pollution.

18.     Ozone pollution contributes to haze. Haze impairs visibility, is an aesthetic problem, and detracts from recreational activities. Haze in areas affected by the Mine's air pollution has impaired visibility, reduces members' enjoyment of the aesthetics in the area, and detracts from Plaintiffs-members' recreational activities.

19.    Ozone pollution adversely affects wildlife and vegetation.  Plaintiffs' members view and enjoy wildlife and have an interest in viewing and enjoying vegetation in areas affected by the Mine's pollution.  The Mine's VOC emissions reduce members' ability to see and enjoy wildlife and vegetation in the affected areas.

20.    Plaintiffs' members fear for their health and safety when coming across the Mine's ventilation air shafts and methane drainage wells.  Plaintiffs' members frequently avoid the area near the Mine altogether because of concerns about Mine's air pollution and the Mine's construction activities and operations.

21.    Defendants' illegal construction, operation, and air pollution (including emission of VOCs) detract from Plaintiffs' members' use and enjoyment of recreational areas near the Mine, expose members to higher levels of air pollutants than they otherwise would be, and makes Plaintiffs' members concerned for their health.

22.    Plaintiffs' members review emissions monitoring information from air pollution sources as part of their efforts to advocate for and achieve clean air, including in areas affected by the Mine's emissions.  By not having the required air permits, which ensure the Mine sufficiently monitors and discloses its air emissions, Plaintiffs' members are deprived of the opportunity and ability to review and use the pollution data from the Mine as part of these efforts.  The lack of complete information about the Mine's air emissions means Plaintiffs' members do not know the full extent of the harmful health effects of the Mine and consequently are reducing their use and enjoyment of the area of the Mine.  Plaintiffs' members are aware of the health, safety, and environmental impacts of the Mine, including the adverse impacts of VOC and methane emissions to their health and to their use and enjoyment of the surrounding environment.

23.     A favorable decision and the requested relief, including declaratory and injunctive relief and imposing civil penalties, will redress these injuries to Plaintiffs' members. If the Mine had the required permits and limits on air emissions based on the best available control technologies, emissions would be reduced, Plaintiffs' concern for their health would be lessened, and Plaintiffs-members' enjoyment and use of the area would be enhanced.  The requested relief will allow members to breath air free of the Mine's unpermitted and harmful air emissions, allow them to view natural scenery and wildlife less impaired by the Mine's emissions, protect the region's natural ecology that members enjoy from the Mine and its pollution impacts, and provide members with information about the Mine's air pollution.

II.     <u>DEFENDANTS</u>

24.     Defendant Mountain Coal operates the Mine.  Mountain Coal obtained and holds federal coal leases from the U.S. Bureau of Land Management (with U.S. Forest Service consent), the mining plan approvals on the federal coal leases from the Office of Surface Management, Reclamation and Enforcement, and mining permits from the Colorado Division of Reclamation, Mining and Safety.  Mountain Coal has offices in Somerset, Colorado.  Mountain Coal is a Delaware corporation doing business in Colorado.  Mountain Coal is a subsidiary of Arch.

25.     Defendant Arch is the parent company of Mountain Coal.  Since 1998, Arch has owned the Mine.  Upon information and belief, Arch is responsible for and makes decisions about environmental compliance at the Mine.  Upon information and belief, Arch's Vice President and Corporate Director of Environmental Affairs sets and advances corporate environmental policy for the company and oversees environmental compliance at all operating facilities and corporate assets, including the Mine.  Upon information and belief, Arch has a

corporate-wide compliance management system that it applies to Mine operations, which includes deployment of an environmental information management system.  Arch identifies the Mine in its "thermal coal portfolio" (or "thermal segment").  Arch includes financial and other information about the Mine in its Form 10-k annual report that it files with the U.S. Securities and Exchange Commission.  When Arch issues quarterly financial guidance, it includes the performance of the Mine in the guidance.

26.     Defendants Mountain Coal and Arch (collectively "Mountain Coal") are "persons" within the meaning of the Clean Air Act, 42 U.S.C. § 7602(e)**.**

**LEGAL BACKGROUND**

I.     <u>CLEAN AIR ACT</u>

27.     The Clean Air Act is a federal statute that prevents and controls air pollution. Enacted in 1970, with significant amendments in 1977 and 1990, its primary purpose is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and productive capacity of its population." 42 U.S.C. § 7401(b)(1).  Title I obligates the U.S. Environmental Protection Agency (EPA) to set standards for air pollutants found to endanger public health and welfare, known as the National Ambient Air Quality Standards or NAAQS. 42 U.S.C. § 7409.  EPA has established NAAQS for six "criteria" pollutants. 40 C.F.R. §§ 50 *et seq*.

28.     One criteria pollutant is ground-level ozone, commonly referred to smog, for which the ambient air standard is "0.070 parts per million (ppm), daily maximum 8-hour average." 40 C.F.R. § 50.15(a).  Ozone pollution is created when emissions of VOCs and nitrogen oxides react in the presence of sunlight. *See* 5 C.C.R. § 1001-5:3D.II(A)(44)(a) (addressing ozone pollution from VOC and nitrogen oxides emissions); 40 C.F.R. §

51.21(b)(50)(i)(b)(1) ("volatile organic compounds and nitrogen oxides are precursors to ozone"). There are many types of VOCS and the regulated ones are listed in 40 C.F.R. § 51.100(s). Methane is an organic compound but currently is not regulated as a VOC. *Id.*

29. In accordance with the Clean Air Act, EPA determines whether air quality is better or worse than the NAAQS for each criteria pollutant within specified areas of each state. 42 U.S.C. § 7407(b) & (d). An area that meets that NAAQS for a pollutant is known as an "attainment" area, 42 U.S.C. § 7407(d)(1)(A)(ii), and one that exceeds the NAAQS is a "nonattainment" area, 42 U.S.C. § 7407(d)(1)(A)(i).

30. States work cooperatively with EPA to implement the Clean Air Act. States prepare State Implementation Plans, or SIPs, that contain a collection of rules—"enforceable emission limitations and other control measures means, or techniques, as well as schedules and timetables for compliance"—designed to, among other things, achieve and maintain compliance with the NAAQS. 42 U.S.C. § 7410(a)(2)(A). At a minimum, SIPs are required to conform to Clean Air Act requirements. The states submit their SIPs to EPA for approval. *Id.* § 7410(k)(1)-(4). If found adequate and approved, the State SIP becomes federal law and its provisions enforceable in federal courts.

31. The Clean Air Act includes a New Source Review (NSR) permitting program, which requires new and modified stationary sources emitting certain amounts of air pollution to install modern pollution control equipment before they are constructed. The Prevention of Significant Deterioration (PSD) program is part of the NSR permit program and specifically applies to sources located within attainment areas. 42 U.S.C. § 7475. EPA has approved Colorado's PSD program, 5 C.C.R. § 1001-5:3D, as a component of the state's SIP. *See, e.g.*, 81 Fed. Reg. 3963 (Jan. 25, 2016); 79 Fed. Reg. 8632 (Feb. 13, 2014). The Colorado Department of

Public Health and Environment administers the Colorado SIP through its Air Pollution Control Division. Colo. Rev. Stat. § 25-7-111.

32.     Colorado's PSD rules provide that "[a]ny new major stationary or major modification…shall not begin actual construction in a[n]…attainment…area unless a permit has been issued containing all applicable state and federal requirements." 5 C.C.R. § 1001-5:3D.I(A)(1).  Major stationary sources in attainment areas are sources specifically identified that emit or have the potential to emit 100 tons per year of VOCs, or 250 tons-per-year of VOCs from all other sources. 42 U.S.C. § 7479(a)(1); 5 C.C.R. § 1001-5:3D.II(A)(25)(a).  Underground coal mines are not a specifically identified source and are subject to the 250 tons per year threshold. A source must also obtain a PSD permit for "any physical change that would occur at a stationary source not otherwise qualifying as a major stationary source under Sections II.A.25.a and II.A.25.b. of this part, if the change would constitute a major stationary source by itself." 5 C.C.R. § 1001-5:3D(II)(25)(c); 40 C.F.R. § 52.21(b)(1)(i)(C).  Sources that have the potential to emit less than 250 tons per year of VOCS must obtain a "minor" source permit, provided they emit at least 5 tons per year. 5 C.C.R. § 1001-5:3B(II)(D)(3)(a).

33.     "Potential to emit" means the "maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable." 40 C.F.R. § 51.166(b)(4); 5 C.C.R. § 1001-5:3A.I(B)(37). Fugitive emissions are excluded from determining whether sources are major. 5 C.C.R. § 1001-5:3A.I(B)(25)(b).  Fugitive emissions are defined as emissions that "could not reasonably pass

through a stack, chimney, vent or other functionally equivalent opening." 40 C.F.R. § 52.21(b)(20); 5 C.C.R. § 1001-2:I.G.  A stationary source is defined as "any building structure, facility or installation, or any combination thereof belonging to the same industrial grouping that emits or may emit any air pollutant subject to regulation under the Federal Act, that is located on one or more contiguous or adjacent properties and that is owned or operated by the same person or by persons under common control." 5 C.C.R. § 1001-5:3A.I(B)(43).

34.     To secure a PSD permit, the permitting agency must identify and the source must implement the "best available control technology" (BACT) to control and limit air emissions. 42 U.S.C. § 7475(a)(3) & (4); 5 C.C.R. § 1001-5:3D(VI)(A)(1).  For sources that are major sources for a criteria pollutant like ozone, implementing BACT is also required for "each pollutant subject to regulation under the" Clean Air Act that are emitted above a certain emission threshold. 42 U.S.C. § 7475(a)(4); 5 C.C.R. § 1001-5:3D.IV(A)(1).  This includes emissions of greenhouse gases, like methane, if a source emits or has the potential to emit at least 75,000 tons per year of the carbon dioxide equivalent, which is a standard unit for measuring greenhouse gas emissions. 5 C.C.R. § 1001-5:3A.I(B)(44)(d); 40 C.F.R. § 52.21(b)(49)(iv).  In addition, the source must demonstrate that its emissions "will not cause or contribute to" exceeding (a) the NAAQS in any air quality control region and (b) the applicable maximum allowable increase over an area's baseline concentrations. 5 C.C.R. § 1001-5:3D(VI)(A)(2).  The source must also conduct a pre-construction "air quality impact analysis" and undertake continuous monitoring for one year before construction begins. 5 C.C.R. § 1001-5:3D(VI)(A)(3).

35.     Under Title V of the Clean Air Act, operating permits are required for all major stationary sources. 42 U.S.C. § 7661a(a).  A Title V major source is "any stationary source" that emits or has the potential to emit one hundred tons per year of VOCs. 42 U.S.C. § 7661(2), *citing*

42 U.S.C. § 7602(j); 5 C.C.R. § 1001-5:3A(I)(B)(25)(b).  Title V permits consolidate all "enforceable emission limitations and standards, a schedule of compliance, …a requirement that the permittee submit to the permitting authority…the results of any required monitoring," including those found in a PSD permit. 42 U.S.C. § 7661c(a).

36.     Each state must develop and submit to EPA for approval a Title V operating permit program that conforms to certain minimum elements established by EPA regulations. 42 U.S.C. § 7661a(d)(1); 40 C.F.R. § 70.1.  EPA approved Colorado's Title V operating permitting program on October 16, 2000. 65 Fed. Reg. 49,919 (Aug. 16, 2000).  Under Colorado's Title V program, "no person shall operate [any major source] without first obtaining an operating permit in accordance with the provisions of this regulation." 5 C.C.R. § 1001-5:3C.II.A.1.

37.     The Clean Air Act's citizen-suit provision provides an enforcement mechanism for the public. 42 U.S.C. § 7604.  This provision empowers "any person" to "commence a civil action on his own behalf" against "any person…who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation…of an emission standard or limitation. 42 U.S.C. § 7604(a)(1).  An "emission standard or limitation" is defined to include provisions found in an EPA-approved SIP and "any requirement to obtain a permit as a condition of operations." 42 U.S.C. § 7604(f)(4).  The citizen suit provision also expressly authorizes claims against "major emitting facilities" that are required to obtain a PSD construction permit. 42 U.S.C. § 7604(a)(3).  Courts have jurisdiction to provide injunctive relief, impose "appropriate civil penalties," order supplemental environmental projects, and award plaintiffs their litigation costs, including attorney and expert fees. 42 U.S.C. § 7604(a), (g)(2); § 7413(b) & (e); § 7604(d). *See* 40 C.F.R. § 19.4 (regulation adjusting for inflation statutory penalty amount to $101,439 per violation per day).

38.     To enforce some Clean Air Act violations, a citizen-plaintiff must provide the alleged violator as well as relevant state agency, EPA, and state and U.S. attorney generals with written notice of the violations at least sixty days before a lawsuit is filed. 42 U.S.C. § 7604(b)(1)(A).  A notice letter is not required before filing suit against facilities that fail to obtain a PSD construction permit.  Further, a citizen is barred from bringing suit if EPA or the state has commenced a lawsuit and is diligently prosecuting the case in court. 42 U.S.C. § 7604(b)(1)(B).

## FACTUAL BACKGROUND

I.      THE WEST ELK MINE

39.     The Mine is an underground coal mine.  It opened in 1981 and mining began in 1982.  The Mine is near Somerset, Colorado, in Gunnison County.  Its support facilities, including offices, a warehouse and shop, rail line loading station, and a coal processing plant, are situated along Highway 133.  The Mine is located within an attainment area for ozone pollution. Ambient air quality in Gunnison County was 93 percent of the NAAQS for ozone during the 3-year period of 2016-2018.  In 2019, Gunnison County's ambient air quality for ozone was 97% of the NAAQS.

40.     Federal authorizations are required for the Mine.  The Mine lies beneath mostly federal land, which is managed by the U.S. Forest Service.  The U.S. Bureau of Land Management (BLM) administers the underlying coal deposits and is authorized to issue coal leases.  The Mine is authorized by seven federal coal leases, covering about 14,395 acres, issued by BLM with Forest Service consent.  In addition to the coal leases, the U.S. Office of Surface Mining, Reclamation and Enforcement (OSM) must approve a mining plan and Colorado's Division of Reclamation, Mining and Safety must issue a mining permit.

41.     The Mine is allowed to extract up to 8.5 million tons of coal per year.  In 2012, the Mine produced almost 7 million tons of coal.  In 2019, the Mine produced approximately 4.15 million tons of coal.

42.     The Mine has access to six coal seams that are stacked underground horizontally. The seams are identified alphabetically—A through F—with the A Seam being the deepest seam. The F Seam is closest to the surface and several hundred feet underground.  The seams are separated by layers of shale, siltstone, and sandstone that vary in thickness from between 15 and 250 feet.

43.     Only one coal seam is mined at a time.  When operations began, the Mine extracted coal from the shallow F seam, which proved uneconomical and ceased around 1991.

44.     In 1992, the Mine began using the longwall-mining method to extract coal from the deeper B seam.  Longwall mining continues today.  It is a deep mining technique that progresses along a seam in sections or "panels."  Once a panel is mined out, the longwall machine is moved to the next panel.  Panel construction involves building roadways and safety and take-out rooms.  Mountain Coal uses a retreating method of longwall mining, constructing shafts off the main shaft to its end and installing required infrastructure.  Mining then retreats back toward the main shaft.  When the longwall machine is moved, the roof of the completed section is allowed to collapse.  Mountain Coal typically moves the longwall machine to a new section or panel about every nine to ten months.

45.     Mining the B coal seam continued until 2008, at which time Mountain Coal moved into the shallower E Seam.  The transition was due to Mountain Coal's concern that continuing in the B seam would prevent mining the overlying E seam.

46.     To mine the E seam to completion, Mountain Coal proposed and obtained authorization to expand two of the seven federal coal leases (the "Expansion").  Necessary federal and state approvals for the Expansion were completed in March 2019.  Under the Expansion, the Mine would extend onto 1,720 acres of the National Forest, within highly valued scenic areas and wildlife habitat known as the Sunset Roadless Area.  The Expansion approvals authorized construction of methane drainage wells, road-building activities at the Mine, and construction of new longwall panels.  The Expansion approvals did not include Clean Air Act permits.

47.     The Expansion will extend mining for 2-3 years and provide access to approximately 10 million tons of coal.  Without the Expansion, the Mine could not continue mining the E seam.  In 2019, Mountain Coal indicated to OSM that, without the Expansion, the Mine would run out of mineable coal in the E seam in December 2019.  Upon information and belief, mining in the Expansion area began in January 2020.  Construction and mining operations in the Expansion area are ongoing and continuing.  Neither the State nor EPA has required Mountain Coal to stop construction or operations until the company secures the required air pollution permits.

48.     Mountain Coal intends to return to the B seam after E-seam mining is completed. In order to return to mining the B seam, additional construction at the Mine is required, including the construction of methane drainage wells and new longwall sections.

II.     THE MINE'S EMISSIONS OF VOLATILE ORGANIC COMPOUNDS AND
        METHANE

49.     The coalification process creates both coal deposits and gases.  At the Mine, VOCs and methane are trapped within the coal seams and surrounding rock layers, mostly in the stratum directly above the coal seams.  Mining frees these gases, which will migrate into the

underground mining areas.  There are more VOCs and methane gases in the deeper coal seams as compared to shallower seams.  At greater depths, more pressure creates higher energy-content coal and larger quantities of gases.

50.     VOCs emissions contribute to ground–level ozone pollution.  The VOCs emitted by the Mine—propane, butane, hexane, pentane, among others—are regulated as a "criteria" pollutant under the Clean Air Act. *See* 40 C.F.R. § 51.100(s).  These VOCs also are "regulated NSR pollutants" under 5 C.C.R. § 1001-5:3D(II)(A)(40).  According to EPA, ozone pollution is harmful to public health.  Ozone pollution causes decreased lung function, increased respiratory symptoms, emergency department visits, hospital admissions for respiratory ailments, and even premature death. 80 Fed. Reg. 65,302-65,309 (Oct. 26, 2015); 73 Fed. Reg. 16,436 (Mar. 27, 2008).  The Colorado Department of Public Health and the Environment found that symptoms that can result from breathing ground-level ozone include stinging eyes and throat, chest pain, coughing, and breathing difficulty. http://www.colorado.gov/pacific/cdphe/ozone-and-your-health.  Those most at risk from ozone pollution are children, active recreationists, manual outdoor laborers, people with pre-existing lung and heart diseases like asthma, and older people. 73 Fed. Reg. at 16,440.  Ozone pollution damages native and nonnative vegetation, including crops and vegetables. 73 Fed. Reg. at 16,485-86; https://www.epa.gov/ground-level-ozone-pollution/ecosystem-effects-ozone-pollution.  Damage to native vegetation results in ecosystem damage, including diminished ecosystem services they provide people for free, like clean air, clean water, and carbon sequestration. *Id*.

51.     The Mine's VOC emissions also contribute to visibility impairment, or haze, in the area.  Visibility is a treasured natural resource, characterized by colorful, panoramic, and scenic views that stretch over hundreds of square miles.  Visibility is measured by the maximum

distance an observer can see a landscape when viewed against a background sky.  Visibility impairment reduces the clarity, color, textures, and distances that one can see.  It occurs when small particles of air pollution, like VOCs, absorb the natural light and interfere with an observer's ability to see landscape features.  The Clean Air Act includes provisions intended to protect visibility—and reduce haze—in national parks and wilderness areas, such as the West Elk Wilderness Area. *See* 42 U.S.C. § 7491; 40 C.F.R. §§ 51.308, 51.309.

52.     Methane is a potent greenhouse gas.  The warming effect of greenhouse gases is measured against carbon dioxide.  Methane's impact on the climate is far greater than carbon dioxide: it is 28-36 times more potent over a 100-year period and 84-87 times more potent over a 20-year timeframe.  Since 2011, EPA regulations require underground mines to report their annual emissions of methane, and other greenhouse gases, which are publicly available for review in an EPA database. *See* 40 C.F.R. § 98.321; § 98.2(a)(1) & Table A-3.  In every year from 2011 through 2018 (the most current year of reporting), Mountain Coal has reported that the Mine's methane emissions have exceeded 75,000 tons in carbon dioxide equivalents.

53.     Methane gas is flammable when exposed to oxygen.  Because it can cause explosions at certain concentrations within ambient air, methane is a safety hazard for the miners.  Federal Mine Safety and Health Administration regulations require Mountain Coal to expel methane from the underground working portions of the Mine.  When methane is released, so too are volatile organic compounds.

54.     Mountain Coal emits methane and VOCs through a ventilation air system that pumps fresh air in and exhausts dirty air out through the Deer Creek shaft and the Sylvester Gulch portal.  In addition, from the surface, Mountain Coal drills vertical methane drainage wells above the longwall to vent excessive methane.  The methane wells are constructed before mining

begins within a longwall panel and then capped until needed.  When mining starts in a particular section, the capped wells are opened, allowing methane and VOCs to be vented during and after mining within that section.  Greater volumes of methane and VOCs are emitted when Mountain Coal begins mining a particular longwall section.  Although later sealed as mining progresses, methane continues to be released to the atmosphere even when wells are capped.

55.     The Mine reported problems with methane in 2000 after several small underground explosions occurred within mined out areas of the B Seam.  Explosions recurred in 2005.   In 2007, Mountain Coal obtained permission to construct the "Deer Creek" ventilation shaft and 168 methane drainage wells to emit methane from the Mine.  The construction of an additional 39 methane drainage wells has been approved specifically for the Expansion.

56.     Between 2011 and 2018, Mountain Coal changed how it was distributing the Mine's methane emissions.  Whereas the majority of released methane in 2011 was emitted from the methane drainage wells, in 2018, the majority of emitted methane came from the ventilation system.  Currently, approximately sixteen percent (16%) of the Mine's methane emissions are released through the methane drainage wells.  Mountain Coal is also attempting to store methane in mined-out sections of the Mine.  Over time, methane will escape from these sealed-off areas to the atmosphere.

III.    AIR PERMITTING FOR THE MINE

57.     In 2010, Mountain Coal obtained an air permit (No. 09GU1382) from Colorado's Air Pollution Control Division (APCD).  This permit covers multiple emission points at the Mine, including emissions of particular matter (PM) from the Deer Creek shafts and Sylvester Gulch portal.  The permit does not apply to VOC emissions from the Mine's ventilation system.

The permit does not cover VOC emissions from the Mine's methane drainage wells. The permit is neither a major source PSD permit nor a Title V permit.

58.     PM emissions are caused by the ventilation system blowing air in and out of the Mine.  The 2010 permit is a "synthetic" minor source permit for PM and PM10 because, by including mandatory and enforceable limits on the volume of air pumped into and out of the Mine, it ensures PM and PM10 emissions are kept below the major source threshold for PM. Under the 2010 permit, Mountain Coal can emit up to 49 tons per year of PM from the ventilation system.

59.     The 2010 permit characterizes the ventilation system as containing non-fugitive sources of PM emissions.  Neither APCD nor Mountain Coal characterized, at the time the permit was issued, these PM emissions as fugitive.  PM emissions at the Mine's other, non-ventilation system, emission points were deemed fugitive emissions in the same permit.  A January 2020 Environmental Assessment prepared for the Expansion characterizes PM emissions from the ventilation shafts as non-fugitive, point source, emissions.

60.     Under Colorado air rules, facilities must submit Air Pollution Emission Notices (APEN) for each emission point that releases at least 2 ton per year of VOCs and PM. 5 C.C.R. § 1001-5:3A.II(A).  Mountain Coal has been submitting APENs for PM emissions from the Mine's ventilation system, including in October 2019.  In the October 2019 APEN, Mountain Coal did not include the volume of VOCs released from the ventilation system or any of the methane drainage wells.  The October 2019 APEN did not identify PM emissions from the Mine's ventilation system as fugitive emissions.

61.     On or about January 16, 2020, Mountain Coal submitted APENs disclosing VOCs emissions from both the ventilation system and the methane drainage wells.  On or about January

16, 2020, Mountain Coal applied for a "minor" source construction permit covering VOC emissions from the ventilation system and the methane drainage wells.  Mountain Coal requested a minor source, as opposed to a PSD, permit by claiming the Mine's VOC emissions are below 250 tons per year (tpy)—the major source threshold for a PSD permit.  APCD has not issued Mountain Coal a minor source construction permit covering the Mine's VOC emissions from the ventilation system and methane drainage wells.  At this time and for the foreseeable future, Mountain Coal is constructing and mining the Expansion.

62.     Mountain Coal collected VOC emission data in 2019 during certain days between late June and early December.  These emission data provided the bases for Mountain Coal's minor source permit application.  From the 2019 data, Mountain Coal computed a daily average for VOC emissions from the Mine's ventilation system (0.102 ton per day) and methane drainage wells (0.329 ton per day).  Though samples were collected from late June through early December 2019, Mountain Coal's daily average calculation was based on emissions data collected on nine days between late August and early December.

63.     Mountain Coal's daily average VOC emission calculation did not factor in a 61-day hydrocarbon event that occurred in 2019.  A hydrocarbon event occurs when liquid hydrocarbons are encountered when mining.  A hydrocarbon event is not a malfunction at the Mine.  Hydrocarbon events occur infrequently but are part of normal operations when mining for coal.  Mining companies plan for hydrocarbon events.  Hydrocarbon events result in elevated VOC emissions.  Upon information and belief, a hydrocarbon event occurred at the Mine in 2011.  The 2019 hydrocarbon event was excluded from the Mine's daily average calculation for VOC emissions.

64.     Mountain Coal estimated that the Mine's actual emissions in 2019 were approximately 213.844 tons.  Mountain Coal calculated this VOC-emission volume by combining VOC emissions from the 61-day hydrocarbon event with 304 days of the daily averages of VOC emissions from the ventilation system and methane drainage wells.

65.     Mountain Coal's daily average VOC emission rate did not account for VOC emissions that occur immediately after the longwall is moved.  Mountain Coal did not move the longwall between August and December 2019.  The rate of VOC emissions is greatest in the early weeks of mining a newly moved longwall section.

66.     To calculate the Mine's potential-to-emit VOCs, Mountain Coal adopted a "safety factor" of 1.4.  This 1.4 safety factor is part of Mountain Coal's minor source permit application.  Mountain Coal did not apply this safety factor to the Mine's actual emissions in 2019.  Mountain Coal applied this safety factor to its calculated daily average of VOC emissions from the ventilation system and methane drainage wells, which does not reflect actual emissions in 2019.

67.     Using 2019 actual emissions—including the hydrocarbon event and the daily averages of VOC emissions—and Mountain Coal's adopted safety factor, the Mine's potential-to-emit VOCs would be approximately 299.382 tons-per-year (213.844 tons-per-year multiplied by 1.4).  This amount exceeds the major source PSD 250 tons-per-year threshold.

68.     The Mine's VOC potential-to-emit exceeds 250 tons-per-year using the Mine's methane emissions in prior years and a developed ratio between methane and VOCs emissions.  Since 2011, the Mine's methane emission volumes are available from the EPA's greenhouse gas reporting database.  The reporting process is done electronically, and requires the reporting facility to certify that the data and information submitted is true, accurate, and complete.  Facilities are required to maintain records documenting the submitted data, including how the

data were developed.  To provide this information, Mountain Coal conducts weekly monitoring through gas velocity readings (which determine gas volumes) and collecting bag samples (which determine methane concentrations).  Between 2011 through 2018, the highest annual volume of the methane emissions was 54,471.64 tons, which occurred in 2011.

69.     A ratio of methane emissions to VOC emissions at the Mine is determinable. Applying that ratio to the amount of methane emitted from the Mine yields a VOC emission rate at the Mine of more than the 250 tons-per-year PSD threshold.  In 2009, Mountain Coal analyzed the composition of gases being emitted from the Mine's methane drainage wells that were drilled into the E seam. A similar gas analysis occurred at the nearby Elk Creek mine.  These data reveal a ratio between methane and VOCs that reflects the relative concentration of these gases within the Mine's emissions.  The maximum VOC to methane ratio, expressed on a mass basis (kilogram to kilogram), is 0.0206.  Applying the maximum ratio to the volume of methane emissions in 2011 results in VOC emissions of 1,122.1 tons.

70.     The Mine's potential-to-emit VOCs exceeds 250 tons-per-year because it must include emissions associated with mining the deeper B seam.  According to Mountain Coal, E-seam mining will generate 50 to 60 percent less methane than B-seam mining.  Because the B seam contains at least double the volume of VOCs and methane than the E seam, the Mine's potential-to-emit VOCs should be doubled that of (1) Mountain Coal's calculation in its permit application or (2) the result obtained using the VOC-to-methane ratio.  The Mine's minor source permit application did not account for mining the B seam.

71.     Mountain Coal had previously mined the B seam.  B-seam mining stopped to ensure that coal within the E seam could be recovered.  Since approximately 2008, Mountain Coal has been mining the E seam.  Once E-seam mining is complete under the Expansion,

Mountain Coal will return to mining the deeper B seam.  Mining will continue for at least another eight years once Mountain Coal returns to the B seam.  There is approximately 53.5 million tons of coal remaining in the B seam.  To mine the deeper B seam, Mountain Coal will construct additional methane drainage wells and new longwall sections.  According to the 2017 Environmental Impact Statement, Mountain Coal will need to construct 77 methane drainage wells to mine the B seam.  Moving to the B seam is a physical or operational change for the Mine.

72.     Mountain Coal's potential-to-emit VOCs did not include VOC emissions from sources other than the ventilation system and the methane drainage wells.

73.     The Mine's potential-to-emit VOCs should account for the Mine's maximum annual production rate of 8.5 million tons.  The amount of coal production relates to VOC and methane emissions.  The Mine's highest coal production occurred over the same four-year period (2011-2014) as the Mine's highest annual rate of VOC and methane emissions.  In 2019, the Mine produced less than half (approximately 4.15 million tons) the maximum amount of coal authorized.

74.     Separate from Mountain Coal's construction permit application, on February 19, 2020, a third-party contractor (Environmental Commodities Corporation) applied for an air construction permit to install and operate four flares at the Mine's methane drainage wells. Environmental Commodities Corporation will be conducting the flaring operations and procuring the flaring equipment.  Flaring operations at the Mine are voluntary.  Flaring is not proposed to be a mandatory, federally enforceable limit in any Mine air permit.  Mountain Coal will not be flaring.  Mountain Coal is not seeking an air permit for flaring or requesting a permit term obligating the Mine to flare methane.

75.     In 2012, Mountain Coal applied for a Title V permit, although the application did not cover VOC emissions.  Mountain Coal withdrew that application two years later.

76.     Mountain Coal recently again applied for a Title V operating permit for the Mine. The company did so because the Mine's potential-to-emit VOCs was well over 100 tons-per-year.  Mountain Coal's application was not timely submitted.  For years before applying for a Title V permit, Mountain Coal has been operating the Mine while emitting more than 100 tons per year of VOCs.  Mountain Coal's permit application was not complete.  Mountain Coal's Title V permit application does not include VOC emission rates that reflect the Mine's actual emissions and potential-to-emit, emission limits that reflect the "best available control technology," the actual and potential-to-emit methane emissions, and flaring activities conducted by Environmental Commodities Corporation.

## CLAIMS FOR RELIEF

### First Claim for Relief
(Constructing and Operating the West Elk Mine without a PSD Permit)

77.     Plaintiffs reallege and incorporate all preceding paragraphs as set forth herein.

78.     Colorado's air rules provide that "[a]ny new major stationary or major modification…shall not begin actual construction in a[n]…attainment…area unless a permit has been issued containing all applicable state and federal requirements." 5 C.C.R. § 1001-5:3D.I(A)(1).  Major stationary source means "any stationary source that emits, or has the potential to emit, two hundred and fifty tons per year or more of any regulated NSR pollutant." 5 C.C.R. § 1001-5:3D(II)(25)(a)(ii).  Major sources are those involving "any physical change that would occur at a stationary source not otherwise qualifying as a major stationary source under Sections II.A.25.a and II.A.25.b. of this part, if the change would constitute a major stationary source by itself." 5 C.C.R. § 1001-5:3D(II)(25)(c). *See also* 40 C.F.R. § 52.21(b)(1)(i)(C).

79.     The Mine is a stationary source.  Mountain Coal does not have a major source PSD permit for the Mine.  The Expansion is a physical change at the Mine.  The Expansion involves moving the longwall to a newly leased and approval area and constructing methane drainage wells, building access roads, constructing longwall panels and related underground roads and crosscuts.  The Expansion itself has the potential-to-emit more than 250 tons per year of VOCs.  The construction necessary to mine the deeper B seam is a physical change at the Mine and also involves moving the longwall and constructing methane drainage wells, constructing longwall panels and related underground roads and crosscuts.  Mining the deeper B seam itself has the potential-to-emit more than 250 tons-per-year of VOCs.

80.     Mountain Coal has been constructing the Mine's Expansion without a PSD permit.  Mountain Coal began operating the Mine's Expansion without a PSD permit since at least January 2020.  Mountain Coal will continue construct and operating the Mine's Expansion after the filing of this Complaint.  After mining in the Expansion area is completed, Mountain Coal will construct and operate mining activities on the Mine's pre-Expansion leased areas without a PSD permit.  Mountain Coal has neither applied for nor obtained a PSD construction permit.  Mountain Coal is not operating in compliance with the terms and conditions that would be imposed by a PSD construction permit for any aspect of the Mine's operations.  Mountain Coal is violating the requirement to obtain a PSD construction permit and emit pollution only in accordance with Best Available Control Technology emission limits.

81.     Each and every day Mountain Coal is constructing the Mine without a PSD construction permit is a separate and distinct violation of the Clean Air Act and Colorado's EPA-approved SIP.  Unless restrained and penalized by an order of this Court, these and similar violations will remain ongoing.  These ongoing violations are enforceable under the Clean Air

Act's citizen suit provision. *See* 42 U.S.C. § 7604(a)(1) & (3).

### Second Claim for Relief
(Operating the West Elk Mine without a Title V Permit)

82.     Plaintiffs reallege and incorporate all preceding paragraphs as set forth herein.

83.     Colorado's air quality regulations, as approved by EPA, provide that "no person shall operate [a major source] without first obtaining an [Title V] operating permit." 5 C.C.R. § 1001-5:3C.II(A)(1).  "Major sources" are defined as those that emit or have the potential-to-emit 100 tons per year of VOCs. 5 C.C.R. § 1001-5:3A(I)(B)(25)(b).

84.     The Mine is a major source for the purpose of the Title V permitting requirement. In 2019, the Mine actually emitted over 100 tons-per-year of VOCs.

85.     Mountain Coal has not obtained a Title V operating permit for the Mine. Mountain Coal is operating the Mine and continues to operate the Mine without a Title V operating permit covering VOC emissions.  Mountain Coal is not operating the Mine in compliance with the terms and conditions that would be imposed by a Title V operating permit or a PSD construction permit.

86.     Each and every day Mountain Coal operates the Mine without a Title V operating permit is a separate and distinct violation of the Clean Air Act and Colorado's EPA-approved air quality regulations.  Unless restrained and penalized by an order of this Court, these and similar violations will remain ongoing.  These ongoing violations are enforceable under the Clean Air Act citizen suit provision, as "emission standard or limitation" is defined, in part, as "any requirement to obtain a permit as a condition of operations." 42 U.S.C. § 7604(f)(4); § 7604(a)(1).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.      Declare Mountain Coal and Arch violated and are violating the Clean Air Act, Colorado's SIP and air quality regulations, and are required by these laws to secure a PSD construction permit and obtain a Title V operating permit before constructing and operating the Mine;

B.      Enjoin Mountain Coal and Arch from constructing and operating so long as the Mine is not in compliance with the Clean Air Act, including by the obtaining the required PSD construction permit and Title V operating permit;

C.      Order Mountain Coal and Arch to apply for and obtain a PSD construction permit;

D.      Assess civil penalties against Mountain Coal and Arch, as authorized by the Clean Air Act, 42 U.S.C. § 7604(a) and based on 42 U.S.C. § 7413 and 40 C.F.R. § 19.4;

E.      Order $100,000 of the civil penalties assessed against Mountain Coal and Arch Coal be used for beneficial mitigation projects to enhance public health and the environment in areas where Plaintiffs' members live, work, and recreate and that are adversely impacted by Mountain Coal and Arch's illegal emissions, construction, and operations, as authorized by 42 U.S.C. § 7604(g)(2) and as is consistent with the purposes of the Clean Air Act;

F.      Order Mountain Coal and Arch to pay Plaintiffs' costs, including reasonable attorneys' fees and expert witness fees, 42 U.S.C. § 7604(d);

G.      Retain jurisdiction of this action to ensure compliance with the Court's Order; and,

H.      Provide such other relief as the court deems just and proper.

Dated this 12th day of May, 2020

*/s/ Neil Levine*
Neil Levine (CO Bar No. 29083)
Public Justice
4404 Alcott Street
Denver, Colorado 80211
(303) 455-0604
nlevine@publicjustice.net

David Nicholas (MA Bar No. 553996)
20 Whitney Road
Newton, Massachusetts 02460
(617) 964-1548
dnicholas100@gmail.com

Attorneys for Plaintiffs

Plaintiffs:

Center for Biological Diversity
Allison Melton
1536 Wynkoop St., Ste. 421
Denver, Colorado 80202

WildEarth Guardians
Jeremy Nichols
2590 Walnut St.
Denver, CO 80205

Sierra Club
Nathanial Shoaff
201 Webster St., Ste. 1300
Oakland, CA 94612

High Country Conservation Advocates
Matt Reed
716 Elk Ave.
Crested Butte, CO 81224

# Exhibit 1



**VIA CERTIFIED MAIL, RETURN RECEIPT REQUEST**

December 17, 2019

John Eaves
Chief Executive Officer
Arch Coal, Inc.
One City Place Drive, Suite 300
St. Louis, Missouri 63144
*USPS Certified Mail # 7018 1130 0000 6779 1441*

Weston Norris
General Manager
John Poulos
Manager of Engineering and Environmental Affairs
Mountain Coal Company, LLC
5174 Highway 133
Somerset, Colorado 81434
*USPS Certified Mail # 7018 1130 0000 6779 1458*

CT Corporation System
Registered Agent
Arch Coal, Inc. and Mountain Coal Company
1900 West Littleton Blvd.
Littleton, Colorado 80120
*USPS Certified Mail # 7018 1130 0000 6779 1465*

      Re:    <u>Sixty-Day Notice of Intent to Sue Mountain Coal Company and Arch Coal Inc.</u>
             <u>for Clean Air Act Violations at the West Elk Mine</u>

Dear Owners and Operators of the West Elk Mine:

      On behalf of WildEarth Guardians, Sierra Club, Center for Biological Diversity, and High Country Conservation Advocates, we are providing Mountain Coal Company and Arch Coal Inc. (collectively referred to here as "MCC") with notice of our intent to file a civil lawsuit for significant and ongoing violations of the Clean Air Act (CAA) at the West Elk coal mine (the "Mine"), located near the town of Somerset in Gunnison County and Paonia in Delta County, Colorado. As detailed below, MCC's activities at the Mine result in emissions of volatile organic compounds that require (1) submitting Air Pollution Emissions Notices to Colorado's Department of Public Health and Environment, (2) obtaining an operating permit, and (3) obtaining a construction permit. Your failure to comply with these reporting and permitting requirements violates the Clean Air Act.

publicjustice.net       **National Headquarters**       **West Coast Office**
                       1620 L Street NW, Suite 630, Washington DC  20036   475 14th Street, Suite 610, Oakland CA  94612
                       (202) 797-8600 phone • (202) 232-7203 fax          (510) 622-8150 phone • (510) 622-8155 fax

Clean Air Act Sixty-Day Notice Letter: West Elk Mine
December 17, 2019
Page 2 of 14

The Clean Air Act's citizen suit provision, 42 U.S.C. § 7604(b)(1), authorizes citizens to commence a civil action against those who are "alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of…an emission standard or limitation under this chapter…," and who are "propos[ing] to construct or constructs any new of modified major emitting facility without a permit required under part C of subchapter I of this chapter (relating to significant deterioration of air quality). 42 U.S.C. § 7604(a)(1) & (3). *See* 42 U.S.C. § 7604(f) (defining "emission standard or limitation").  Under this provision, courts can award injunctive relief, 42 U.S.C. § 7604(a), and impose civil penalties, *id.* § 7413(b). *See also* 40 C.F.R. § 19.4; 84 Fed. Reg. 2056, 2059 (Feb. 6, 2019); 42 U.S.C. § 7604(g)(2) (authorizing funding beneficial mitigation projects).  Courts further award prevailing plaintiffs their litigation costs, including attorney and expert fees, under 42 U.S.C. § 7604(d).

Some violations that are enforceable through the citizen suit provisions require notice to the alleged violating party as well as the relevant state agency and EPA. 42 U.S.C. § 7604(b).  This notice letter has been prepared and circulated to satisfy this requirement.  We intend to file suit in U.S. District Court sixty days after this letter's postmark date to enjoin the identified violations, obtain other injunctive relief, seek civil penalties and a beneficial environmental project, and recoup litigation costs including attorney and expert fees.

------------------------

## I.      The Specific Clean Air Act Provisions That Have Been, and Continue To Be, Violated

The Clean Air Act is designed to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and productive capacity of its population." 42 U.S.C. § 7401(b)(1).  It requires the Environmental Protection Agency (EPA) to establish primary and secondary national ambient air quality standards (or NAAQS) for pollutants that EPA has issued air quality criteria. 42 U.S.C. §§ 7408, 7409.  Ground-level ozone pollution results when airborne "volatile organic compounds" or nitrogen oxides react with sunlight—this is commonly referred to as smog.  EPA has identified ozone as a "criteria" pollutant and promulgated a NAAQS for ozone. 40 C.F.R. §§ 50.9, 50.10 and 50.19.

EPA designates areas within each state where air quality is better or worse than the NAAQS.  An area that meets the NAAQS for a particular pollutant is designated an "attainment" area and an area that does not meet the standard is designated a "nonattainment" area. 42 U.S.C. § 7407(d)(1)(A)(i).  The Mine is in an ozone attainment area.  Consequently, Clean Air Act rules associated with the Prevention of Significant Deterioration program—designed to ensure air quality within attainment areas remains compliant with the NAAQS (42 U.S.C. § 7470)—apply.

The Clean Air Act also requires each state to adopt and submit to EPA for approval a State Implementation Plan, or SIP. 42 U.S.C. § 7410.  Through SIPs, states ensure compliance with the air quality standards, *id.* § 7410(a)(2)(A), § 7502(c)(6), with EPA's role reserved for approving or disapproving SIPs and taking action when a state's SIP is found inadequate.  Once approved by EPA, SIPs become federal law and enforceable under the Clean Air Act. *See* 42

National Headquarters
1620 L Street NW, Suite 630, Washington DC  20036
(202) 797-8600 phone • (202) 232-7203 fax

West Coast Office
475 14th Street, Suite 1230, Oakland CA  94612
(510) 622-8150 phone • (510) 622-8155 fax

Clean Air Act Sixty-Day Notice Letter: West Elk Mine
December 17, 2019
Page 3 of 14

U.S.C. § 7413, § 7604.  EPA has approved elements of Colorado's State Implementation Plan, which are set forth in state regulations implementing the Colorado Air Pollution Prevention and Control Act, C.R.S. §§ 25-7-101 *et seq.*; 40 C.F.R. § 52.320.

A.      Air Pollution Emission Notice

Colorado's SIP contains an emission reporting requirement, which has been approved by EPA. *See* 40 C.F.R. § 52.320.  That provision provides that no existing, new, or modified stationary source can emit air pollutants "unless and until" the source files an Air Pollution Emission Notice (APEN) with Colorado's Air Pollution Control Division. 5 C.C.R. § 1001-5:3A.II(A).  A source in an attainment area must submit an APEN covering each emission point that releases 2 or more tons per year of a criteria pollutant, like VOCs. 5 C.C.R. § 1001-5:3A.II(A).  An APEN must include an estimate of the quantity and composition of a source's emissions, the location of the emissions, the name and address of the persons who operate and own the facility, the nature of the facility, process, or activity, and other information required by the applicable APEN form.

To determine whether a stationary source reaches the quantity threshold that triggers the APEN filing requirement, a facility can use actual emission data or apply an appropriate method to estimate emissions. 5 C.C.R. § 1001-5:3A.II(B)(1).  All types of emissions count toward the threshold. 5 C.C.R. § 1001-5:3A.II(A); 5 C.C.R. § 1001-5:3A.II(B)(3).  A submitted APEN is valid for five years, at which time a revised APEN must be submitted. 5 C.C.R. § 1001-5:3A.II(B)(2).  APENs must also be revised when a significant change in operations occurs. 5 C.C.R. § 1001-5:3A.II(C).  Concurrent with filing the APEN, the source must also submit an APEN fee. 5 C.C.R. § 1001-5:3A.II(A).

B.      Construction Permits

As approved by EPA, Colorado's SIP contains a construction permit requirement for both "minor" and "major" stationary sources of air pollution. *See* 40 C.F.R. § 52.320.  First, Colorado requires construction permits for all stationary sources throughout the state. 5 C.C.R. § 1001-5:3B(II)(A)(1) ("[N]o person shall commence construction of any stationary source or modification of a stationary source without first obtaining or having a valid construction permit.").  The trigger for this minor-source permitting requirement varies depending on the pollutant involved, the volume of emissions, and the location of the source. *See* 5 C.C.R. § 1001-5:3B(II)(D)(2).  Relevant here, for sources emitting volatile organic compounds in an attainment area, construction permits are required if VOC emissions from all emission points total five tons per year or more. 5 C.C.R. § 1001-5:3B(II)(D)(3)(a).  To secure a minor source permit, emissions must conform to the applicable ambient air quality standard and the source must implement "reasonably available control technology." 5 C.C.R. § 1001-5:3B(III)(D)(1), (2).

There are different triggers and rules for "major" air pollution sources constructed in attainment areas. 5 C.C.R. § 1001-5:3D.  Under the state's Prevention of Significant Deterioration (PSD) program, construction permits are required when a new source's potential-to-emit is at least 250 tons per year of VOCs. 5 C.C.R. § 1001-5:3D(II)(25)(a)(ii) (defining

publicjustice.net          National Headquarters                              West Coast Office
1620 L Street NW, Suite 630, Washington DC  20036          475 14th Street, Suite 1230, Oakland CA  94612
(202) 797-8600 phone • (202) 232-7203 fax          (510) 622-8150 phone • (510) 622-8155 fax

major stationary source).  A PSD construction permit is also required for sources undergoing a "major" modification, which, as defined, means (1) there is a physical change in the facility or a change in the method of operations, (2) a significant emissions increase in a regulated NSR pollutant, defined as 40 tons per year of VOCs, 5 C.C.R. § 1001-5:3D(II)(44)(a), and (3) a significant net emissions increase of that pollutant, 5 C.C.R. § 1001-5:3D(II)(27). 5 C.C.R. § 1001-5:3D(II)(23).  Sources must also obtain a PSD construction permit for "any physical change that would occur at a stationary source not otherwise qualifying as a major stationary source under Sections II.A.25.a and II.A.25.b. of this part, if the change would constitute a major stationary source by itself." 5 C.C.R. § 1001-5:3D(II)(25)(c).

When a PSD permit is required, such regulated sources must apply the Best Available Control Technology (BACT) to its emissions of all regulated pollutants that exceed relevant emission thresholds. 5 C.C.R. § 1001-5:3D(IV).  BACT is an "emissions limitation…based on the maximum degree of reduction of each regulated NSR pollutant that would be emitted from any proposed major stationary source or major modification that the Division or Commission, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant." 5 C.C.R. § 1001-5:3D(II)(A)(8).  BACT applies not only to emissions of criteria pollutants, like volatile organic compounds, but also to greenhouse gases like methane when emissions, based on carbon-dioxide-equivalents ($CO_2e$), are above 75,000 tons per year. 5 C.C.R. § 1001-5:3A.I(B)(44)(d); *see also* 40 C.F.R. § 51.166(b)(48)((iii) & (iv); 40 C.F.R. § 52.21(b)(49)(iv); 81 Fed. Reg. 68,110, 68,113 (Oct. 3, 2016) (establishing 75,000 tpy of $CO_2e$ as "significant emission rate" threshold for implementing BACT for greenhouse gases like methane).

C.     Operating Permits

Title V of the Clean Air Act establishes an operating permit program. 42 U.S.C. § 7661a(a).  This requirement applies to operating facilities that meet the definition of a "major source"—those that have the potential to emit 100 tons per year or more of any criteria pollutant. 42 U.S.C. § 7661(2)(B); § 7602(j).  Although the Title V permitting program does not impose its own substantive air quality control requirements, it compiles air quality controls imposed on emission units and sources through other means and requires that permits contain adequate monitoring, recordkeeping, and reporting requirements. 42 U.S.C. §§ 7661c(c).

EPA regulations establish minimum elements that must be included in state operating permit programs. *See* 40 C.F.R. § 70.1.  Title V requires each state to develop and submit to EPA for approval an operating permit program. 42 U.S.C. § 7661a(d)(1).  EPA approved Colorado's Title V operating permit program in 2000. 65 Fed. Reg. 49,919 (Aug. 16, 2000).  Colorado's program is codified at 5 Code of Colorado Regulations, 1001-5, Regulation No. 3, Part C.

publicjustice.net          National Headquarters                    West Coast Office
1620 L Street NW, Suite 630, Washington DC  20036          475 14th Street, Suite 1230, Oakland CA  94612
(202) 797-8600 phone • (202) 232-7203 fax          (510) 622-8150 phone • (510) 622-8155 fax

Clean Air Act Sixty-Day Notice Letter: West Elk Mine
December 17, 2019
Page 5 of 14

## II.   Factual Background

The West Elk Mine is an underground coal mine located in Gunnison County, Colorado and the North Fork Valley.  It is owned by Arch Coal Company (Arch Coal), who purchased the mine in 1998, and is operated by Mountain Coal Company, a subsidiary of Arch Coal.

The Mine is located on mostly federal land within the Gunnison National Forest as well as some private land.  Over the years, MCC acquired and continues to have access to seven federal coal leases and one private lease.  The federal leases were issued by the U.S. Bureau of Land Management, which administers federal coal reserves under the authority of the Mineral Leasing Act, 30 U.S.C. §§ 181 *et seq*.  The U.S. Forest Service manages national forests and "consented" to the leases after considering the mine's impact on surface resources. *See* 30 U.S.C. § 201(a)(3)(iii), § 207(a).

The mine's coal seams are identified by letter—A through F—in ascending stratigraphic order.  Although the F Seam is closest to the surface, it is several hundred feet underground. Shale, siltstone, and sandstone layers separate the coal seams, varying in thickness from between 15 and 250 feet.  The deeper B seam was mined from approximately 1992 through 2008.  MCC is now mining the E seam and the mine expansion will allow MCC to, at least initially, continue to do so.  MCC is using the "longwall" method to extract coal at the mine.

Methane and other organic gases are found with coal deposits, as they are both converted from the same biological material.  Because methane poses an explosion risk to miners, federal law requires coal companies to remove the gas from underground mines.  MCC flushes the methane from the mine through a powerful ventilation system and with methane drainage wells that are drilled from the surface and permit the gas to rise and escape.  Deeper coal seams contain greater concentrations of methane and other organic gases.

For the two largest BLM leases—COC1362 (4,836 acres) and COC67232 (1,517 acres)—MCC secured lease modifications in December 2017 to access additional coal reserves south of the mine and to build 43 additional methane drainage wells and access roads.  The expansion totals 1,720 acres and includes approximately 10 million tons of coal reserves that were otherwise not accessible.  The expansion also required authorizations from Colorado's Division of Reclamation, Mining and Safety (DRMS) and the U.S. Office of Surface Mining Reclamation and Enforcement (OSMRE), in accordance with Colorado's Surface Coal Mining Reclamation Act and the federal Surface Mining Control and Reclamation Act (SMCRA).  On November 14, 2018, DRMS approved the permit revision, adding 2,620 acres to the mine's permit area (1,720 acres within the two modified BLM leases and some additional private lands). OSMRE provided its approval, known as a mining plan of operation modification, on April 19, 2019.  A legal challenge to the OSMRE's approval is ongoing, with the agency currently redoing its environmental analysis under the National Environmental Policy Act as required by a court order.

publicjustice.net          National Headquarters                        West Coast Office
                          1620 L Street NW, Suite 630, Washington DC  20036     475 14th Street, Suite 1230, Oakland CA  94612
                          (202) 797-8600 phone • (202) 232-7203 fax       (510) 622-8150 phone • (510) 622-8155 fax

Clean Air Act Sixty-Day Notice Letter: West Elk Mine
December 17, 2019
Page 6 of 14

### III.    The Violating Actions

Due to emissions of volatile organic compound (VOC) emissions, MCC is required to submit reporting notices with the state and obtain state-issued air permits.  The notices and permits are necessary for MCC to operate the mine and commence construction of the mine's expansion.

We have calculated VOC emissions from the mine for the years 2011 though 2018. These calculations are based on an emission factor—expressed as a ratio between methane (CH4) and volatile organic compounds—and the mine's annual methane emissions, as has been reported to the EPA since 2011 under the GHG Reporting Rule, 40 C.F.R. Part 98.[1]  MCC reports the mine's cumulative annual methane emissions and emissions from each of the mine's ventilation shafts and individual methane drainage wells.

The emission factor was developed using publicly available data that is specific to the mine and the region.  The 95% confidence interval for the average VOC/methane (CH4) ratio is 12.38%.  This narrow confidence interval means the ratio is likely to be highly accurate and provides a scientifically supportable basis for determining emissions.  The ratios are shown here:

| Parameter | VOC/CH$_4$ ratios expressed on a mass basis (kg/kg). |
|---|---|
| Maximum | 0.0206 |
| Minimum | 0.0144 |
| Average | 0.0178 |
| Median | 0.0184 |
| 95% Confidence Limits for the Average | ±12.38% |

The expressed ratios reveal that the gases released from the mine have a very high concentration of methane and low VOC concentrations.  But due to the sheer volume of gases escaping the mine, VOC emissions are significant.  Using the maximum, average, and minimum ratios and annual reported methane emissions, the mine's total VOC emissions for each year between 2011 and 2018 are shown in Tables 1-3.

---

[1]      CAA regulations require underground coal mines to report their annual greenhouse gas emissions to EPA. 40 C.F.R. § 98.1; 40 C.F.R. § 98.320 (reporting required for active underground coal mines that emits methane from mine shafts or ventilation holes).  This reporting mandate applies if a mine is releasing 36.5 million cubic feet or more of methane annually. 40 C.F.R. § 98.321, § 40 C.F.R. § 98.2(a)(10), Table A-3.  Every year since 2011, MCC has reported its GHG emissions.

publicjustice.net    National Headquarters
1620 L Street NW, Suite 630, Washington DC  20036
(202) 797-8600 phone • (202) 232-7203 fax

West Coast Office
475 14th Street, Suite 1230, Oakland CA  94612
(510) 622-8150 phone • (510) 622-8155 fax

Clean Air Act Sixty-Day Notice Letter: West Elk Mine
December 17, 2019
Page 7 of 14

**Table 1**

| Summary of estimated West Elk maximum VOC emissions from the mine ventilation systems and degassing wells over the time series of 2011 to 2018. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Source | Maximum VOC Emissions (Tons) Based on the Upper 95% Confidence Limit | | | | | | | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
| *Ventilation System (Shaft 4 ESM 8 Entry 42-43 XC)* | *31* | *200* | *14* | *15* | *12* | *7* | *2* | *2* |
| *Ventilation System (Shaft 4 ESM 8 Entry 43-44 XC)* | *276* | *241* | *193* | *202* | *148* | *116* | *179* | *113* |
| *Ventilation System (Shaft 4 ESM 8-9 Entry 43 XC)* | *47* | *33* | *36* | *42* | *35* | *33* | *42* | *35* |
| Ventilation System (Shaft 4 Total) | 354 | 292 | 242 | 259 | 195 | 156 | 223 | 150 |
| Sly Gulch Exhaust Fan | 80 | 105 | 116 | 95 | 80 | 94 | 119 | 70 |
| CH4V Total liberated from all ventilation systems | 434 | 397 | 358 | 353 | 274 | 250 | 342 | 220 |
| CH4D Total Liberated from all MDWs | 688 | 441 | 325 | 238 | 166 | 116 | 59 | 45 |
| TOTAL | 1,122 | 838 | 683 | 592 | 441 | 366 | 401 | 265 |

**Table 2**

| Summary of estimated West Elk average VOC emissions from the mine ventilation systems and degassing wells over the time series of 2011 to 2018. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Source | Average VOC Emissions (Tons) Based on the Upper 95% Confidence Limit | | | | | | | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
| *Ventilation System (Shaft 4 ESM 8 Entry 42-43 XC)* | 27 | 16 | 12 | 13 | 10 | 6 | 2 | 2 |
| *Ventilation System (Shaft 4 ESM 8 Entry 43-44 XC)* | 239 | 208 | 166 | 174 | 128 | 100 | 155 | 98 |
| *Ventilation System (Shaft 4 ESM 8-9 Entry 43 XC)* | 40 | 28 | 31 | 36 | 30 | 29 | 36 | 30 |
| Ventilation System (Shaft 4 Total) | 306 | 252 | 209 | 223 | 168 | 135 | 193 | 130 |
| Sly Gulch Exhaust Fan | 69 | 90 | 100 | 82 | 69 | 81 | 103 | 60 |
| CH4V Total liberated from all ventilation systems | 375 | 343 | 310 | 305 | 237 | 216 | 295 | 190 |
| CH4DTotal Liberated from all MDWs | 595 | 381 | 281 | 206 | 144 | 100 | 51 | 39 |
| TOTAL | 970 | 724 | 590 | 511 | 381 | 316 | 347 | 229 |

publicjustice.net

National Headquarters
1620 L Street NW, Suite 630, Washington DC  20036
(202) 797-8600 phone • (202) 232-7203 fax

West Coast Office
475 14th Street, Suite 1230, Oakland CA  94612
(510) 622-8150 phone • (510) 622-8155 fax

Clean Air Act Sixty-Day Notice Letter: West Elk Mine
December 17, 2019
Page 8 of 14

**Table 3**

| Summary of estimated West Elk minimum VOC emissions from the mine ventilation systems and degassing wells over the time series of 2011 to 2018. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Source | Minimum VOC Emissions (Tons) Based on the Upper 95% Confidence Limit | | | | | | | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
| *Ventilation System (Shaft 4 ESM 8 Entry 42-43 XC)* | 22 | 13 | 9 | 10 | 8 | 5 | 1 | 1 |
| *Ventilation System (Shaft 4 ESM 8 Entry 43-44 XC)* | 193 | 168 | 135 | 141 | 103 | 81 | 125 | 79 |
| *Ventilation System (Shaft 4 ESM 8-9 Entry 43 XC)* | 33 | 23 | 25 | 29 | 24 | 23 | 29 | 25 |
| Ventilation System (Shaft 4 Total) | 247 | 204 | 169 | 181 | 136 | 109 | 156 | 105 |
| Sly Gulch Exhaust Fan | 56 | 73 | 81 | 66 | 56 | 66 | 83 | 49 |
| CH4V Total liberated from all ventilation systems | 303 | 277 | 251 | 247 | 192 | 175 | 239 | 154 |
| CH4D Total Liberated from all MDWs | 481 | 308 | 227 | 166 | 116 | 81 | 42 | 31 |
| TOTAL | 784 | 586 | 478 | 413 | 308 | 256 | 281 | 185 |

Annual VOC emission volumes for each methane drainage wells operating between 2011 and 2018 are shown in the Appendix attached to this letter.

Based on the VOC emissions shown, the thresholds triggering the notification and permitting requirements are met and MCC's failure to comply with these requirements violates the Colorado SIP and the Clean Air Act.

A.      Failure to submit APENs to the State—violation of 5 C.C.R. § 1001-5:3A.II(A)

The Colorado SIP requires stationary sources to file with the state APENs, covering all emission points at the source that release at least 2 tons per year of VOCs. 5 C.C.R. § 1001-5:3A.II(A) ("no person shall allow emission of air pollutants from, or construction, modification or alteration of, any facility, process or activity which constitutes a stationary source…from which air pollutants are, or are to be, emitted" unless an APEN is filed); *id.* § 1001-5:3A.II(B(3)(a) (establishing emission thresholds triggering APEN submission requirement). A "stationary source" is "[a]ny building, structure, facility, or installation, or any combination thereof belonging to the same industrial grouping that emits or may emit any air pollutant subject to regulation under the Federal Act, that is located on one or more contiguous or adjacent properties and that is owned or operated by the same person or by persons under common control." 5 C.C.R. § 1001-5:3A.I(B)(43). The mine is a stationary source.

At the mine, both of the ventilation shafts—Shaft 4 and Sly Gulch Exhaust Fan—have emitted more than 2 tons per year of VOCs annually from 2014 through 2018. Tables 1-3 reveal that annual VOC emissions from Shaft 4 were between 180.7 and 258.5 tons in 2014, 136.0 and 194.5 tons in 2015, 109.3 and 156.3 tons in 2016, 156.0 and 223.2 tons in 2017, and 105 and 150 tons in 2018. Annual VOC emissions from the Sly Gulch Exhaust Fan were between 66.3 and 94.9 tons in 2014, 55.9 and 79.9 tons in 2015, 65.6 and 93.9 tons in 2016, 83.0 and 118.7 tons in

publicjustice.net          National Headquarters
1620 L Street NW, Suite 630, Washington DC  20036
(202) 797-8600 phone • (202) 232-7203 fax

West Coast Office
475 14th Street, Suite 1230, Oakland CA  94612
(510) 622-8150 phone • (510) 622-8155 fax

2017, and 49 and 70 tons in 2018.  The active methane drainage wells also exceeded the 2-ton-per-year threshold during this same time period: in 2018, six of six wells released more than 2 tpy; in 2017, nine of fourteen wells released more than 2 tpy; in 2016, ten of twelve released more than 2 tpy; in 2015, thirteen of sixteen wells released more than 2 tpy; in 2014, seventeen of twenty-one were above the threshold. *See* Attached Spreadsheet.

Mining on the newly leased and permitted lands (the mine expansion) will continue to emit at least 2 tons of VOCs annually from two ventilation shafts and result in VOC emissions of 2 or more tons each year from the new methane drainage wells constructed in the mine expansion area.

MCC has not submitted APENs that address VOC emissions from the mine's ventilation air shafts and methane drainage wells.  MCC has also not paid the required APEN fees.  By not submitting the required APENs and APEN fees, MCC is violating the CAA and the EPA-approved Colorado SIP (40 C.F.R. § 52.320(c)), and is both operating the mine and constructing the mine expansion unlawfully.  Violations occurred each day for the last five years, and continue to occur, and are enforceable through the Clean Air Act's citizen suit provision.

B.    Failure to obtain a Title V Operating Permit— violation of 5 C.C.R. § 1001-5:3C.II(A)(1)

Colorado's air quality regulations, as approved by EPA, provide that "no person shall operate [a major source] without first obtaining an [Title V] operating permit." 5 C.C.R. § 1001-5:3C.II(A)(1).  "Major sources" are defined as those that emit or have the potential-to-emit 100 tons per year of VOCs. 5 C.C.R. § 1001-5:3A(I)(B)(25)(b).

As Tables 1-3 detail, the mine qualifies as a "major source" because it emits and has the potential to emit more than 100 tpy of VOCs.  MCC has operated and continues to operate the mine without a Title V operating permit covering these VOC emissions.  As a result, MCC is violating the CAA.  This violation is enforceable under the CAA citizen suit provision, as "emission standard or limitation" is defined, in part, as "any requirement to obtain a permit as a condition of operations." 42 U.S.C. § 7604(f)(4); § 7604(a)(1).

C.    Failure to obtain a construction permit—violation of 5 C.C.R. § 1001-5:3D.I(A)(1)

The volume of VOC emissions from the mine's expansion itself triggers the requirement for MCC to obtain a PSD construction permit.  The definition of "major source" includes "any physical change" occurring "at a stationary source not otherwise qualifying as a major stationary source under Sections II(a)25)(a) and (b)…, if the change…constitutes a major stationary source itself." 5 C.C.R. § 1001-5:3D.II(A)(25)(c).  The mine's expansion is a major source under this definition: the mine is a "minor source" that is undergoing a physical expansion that has the potential to emit over 250 tpy of VOCs.

publicjustice.net          National Headquarters                      West Coast Office
                           1620 L Street NW, Suite 630, Washington DC  20036   475 14th Street, Suite 1230, Oakland CA  94612
                           (202) 797-8600 phone • (202) 232-7203 fax   (510) 622-8150 phone • (510) 622-8155 fax

The Mine is undergoing a physical change.  In the summer of 2019, it began the expansion onto adjacent federal lands that were leased by BLM and the Forest Service, permitted by the state, and approved by OSMRE: BLM and the Forest Service approved the Mine's expansion on December 15, 2017, the Colorado Division of Reclamation, Mining and Safety provided its approval on November 14, 2018, and OSMRE approved a mining plan of operation modification on April 19, 2019.  The expansion will provide MCC with access to additional coal reserves (10 million tons of coal) and extend the life of the Mine by at least three years.  As part of the expansion, MCC will construct 43 new methane drainage wells and access roads on approximately 2,620 acres.[2]

The existing mine—before the expansion—was not regulated as a "major" source. *See* 5 C.C.R. § 1001-5:3D.II(A)(25)(c).  The state issued MCC a "synthetic minor source" construction permit (No. 09GU1382) in 2010.

The expansion "constitutes a major stationary source itself" because it has the "potential to emit" 250 tons or more of VOCs. 5 C.C.R. § 1001-5:3D.II(A)(25)(c), § 1001-5:3D.II(A)(25)(a)(ii).  Potential-to-emit is defined as "[t]he maximum capacity of a stationary source to emit a pollutant under it physical and operational design." 5 C.C.R. § 1001-5:3A.I(B)(37).

Conservatively, the mine expansion's potential-to emit VOCs is at least between 784 tpy and 1122.1 tons per year of VOCs, which was what MCC actually emitted in 2011. *See* 5 C.C.R. § 1001-5:3A.I(B)(37) ("The maximum capacity of a stationary source to emit a pollutant under it physical and operational design.").  It is known that production rates in the expansion area will remain the same as on the leased parcels, *High Country Conservation Advocates v U.S. Forest Service*, 52 F.Supp.3d 1174, 1194 (D. Colo. 2014) ("Given that the rate of mining is expected to remain the same, the agencies concluded that VOC emissions were unlikely to change").  Mine production is capped at 8.5 million tons of coal per year; however, from 2011 through 2018, coal production ranged from between 4.15 million and about 7 million tons of coal per year, never reaching maximum capacity.  The above Tables 1-3 show VOC emissions ranged 784.4 to 1122.1 tpy in 2011, 585.7 to 837.8 tpy in 2012, 477.3 to 683.2 tpy in 2013, 413.5 to 591.5 tpy in 2014, 308.0 to 440.6 tpy in 2015, 255.8 to 365.9 in 2016, 280.6 to 401.4 tpy in 2017, and 185 to 265 tpy in 2018.  Based on past actual emissions, the expansion has the potential to emit VOCs above the 250-ton-per-year threshold.  The mine expansion's potential-to-emit rises even higher based on the maximum production rate of 8.5 million tons of coal per year, a production cap that the mine is allowed to achieve but has not yet reached.

Because the mine expansion is a major source itself, MCC is violating the requirement to obtain a PSD construction permit.  This violation is enforceable under the Clean Air Act's citizen suit provision. *See* 42 U.S.C. § 7604(a)(3).

---

[2]  In 2007, MCC received Forest Service approval to build 168 methane drainage wells on National Forest lands that had already been leased by BLM.  In connection with the 2017 lease modification, the Forest Service approved new drainage wells and additional roads.

publicjustice.net

National Headquarters
1620 L Street NW, Suite 630, Washington DC  20036
(202) 797-8600 phone • (202) 232-7203 fax

West Coast Office
475 14th Street, Suite 1230, Oakland CA  94612
(510) 622-8150 phone • (510) 622-8155 fax

Clean Air Act Sixty-Day Notice Letter: West Elk Mine
December 17, 2019
Page 11 of 14

## IV.  Persons/Parties Giving Notice

The parties giving notice, including their full names, addresses and telephone numbers, are as follows:

Center for Biological Diversity
Allison Melton
1536 Wynkoop St., Ste. 421
Denver, Colorado 80202
(303) 915-8308

WildEarth Guardians
Jeremy Nichols
2590 Walnut St.
Denver, CO 80205

Sierra Club
Nathanial Shoaff
201 Webster St., Ste. 1300
Oakland, CA 94612

High Country Conservation Advocates
Matt Reed
716 Elk Ave.
Crested Butte, CO 81224

Counsel for the noticing parties have been retained and their contact information is:

Neil Levine
Public Justice
4404 Alcott Street
Denver, Colorado 80211
(303) 455-0604
nlevine@publicjustice.net

David Nicholas
20 Whitney Road
Newton, Massachusetts 02460
(617)-964-1548
dnicholas100@gmail.com

publicjustice.net     National Headquarters                                West Coast Office
                        1620 L Street NW, Suite 630, Washington DC  20036    475 14th Street, Suite 1230, Oakland CA  94612
                        (202) 797-8600 phone • (202) 232-7203 fax            (510) 622-8150 phone • (510) 622-8155 fax

Clean Air Act Sixty-Day Notice Letter: West Elk Mine
December 17, 2019
Page 12 of 14

## V.    Persons/Parties Responsible for the Alleged Violations

Arch Coal Company
One City Place Drive, Suite 300
St. Louis, Missouri 63144

Mountain Coal Company, LLC
5174 Highway 133
Somerset, Colorado 81434

## VI.  Location of the Alleged Violations

The location of the alleged Clean Air Act violations is the West Elk coal mine.  The nearest towns are Somerset, Colorado in Gunnison Country and Paonia, Colorado in Delta County.  The mine is located mostly on federal lands managed by the U.S. Forest Service, with the U.S. Bureau of Land Management administering the subsurface mineral estate.

## VII. The Date(s) of the Alleged Violations

It is our understanding and belief that the mine operates every day, although MCC and Arch Coal have access to the specific dates of mining operations.  Each day MCC has operated and continuous to operate the mine without having filed an APEN covering VOC emissions (and paying the appropriate fee) is a violation of the Clean Air Act.  Each day MCC has operated and continuous to operate the mine without a Title V operating permit is a violation of the Clean Air Act.  Further, each day MCC engaged in construction activities to advance the mine's expansion without securing a PSD construction permit is a violation of the Clean Air Act.  We intend to seek penalties for each of these violations.

## VIII.  Conclusion

As owners and operators of the West Elk underground coal mine, you are violating the Clean Air Act and the Colorado SIP, including requirements to file APENs detailing VOC emissions and obtaining necessary permits for constructing and operating the mine.  WildEarth Guardians, Sierra Club, Center for Biological Diversity, and High Country Conservation Advocates intend to file suit to enjoin these violations, obtain civil penalties to the full extent permitted by law, recover their attorney fees and costs, and obtain any other appropriate relief.  These organizations intend to file suit at the expiration of the 60-day notice period.  They believe that the data and information contained in this letter provide MCC and Arch Coal with sufficient information about the alleged violations and the ability to come into compliance with the CAA and the Colorado SIP.  Additional information, including information not yet available to WildEarth Guardians, Sierra Club, Center for Biological Diversity, and High Country

publicjustice.net          National Headquarters                                    West Coast Office
                          1620 L Street NW, Suite 630, Washington DC  20036        475 14th Street, Suite 1230, Oakland CA  94612
                          (202) 797-8600 phone • (202) 232-7203 fax               (510) 622-8150 phone • (510) 622-8155 fax

Clean Air Act Sixty-Day Notice Letter: West Elk Mine
December 17, 2019
Page 13 of 14

Conservation Advocates, may reveal additional violations, which this letter intends to cover. And we intend to bring litigation that covers actions and violations that may occur in the future.

If you have any questions regarding these allegations, believe any of the information stated above is incorrect or would like to discuss the matter, please contact undersigned counsel. These organizations would welcome the opportunity to discuss this matter with you and potentially resolve any disputes so as to avoid time-intensive and resource-consuming litigation. Please contact us promptly if you believe we do not understand facts about the mine and the alleged violations correctly or wish to discuss effective remedies for the violations noted in this letter.  Thank you.

Sincerely,

*/s/ Neil Levine*

Neil Levine
Public Justice
4404 Alcott Street
Denver, Colorado 80211
(303) 455-0604
nlevine@publicjustice.net

David Nicholas
20 Whitney Road
Newton, Massachusetts 02460
(617)-964-1548
dnicholas100@gmail.com

cc: (by certified mail-return receipt requested)

Andrew Wheeler, Administrator
Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Ave., NW
Mail Code 1101A
Washington, D.C. 20460
*USPS Certified Mail # 7018 1130 0000 6779 1380*

Gregory Sopkin
Regional Administrator
Environmental Protection Agency Region 8
1595 Wynkoop Street

publicjustice.net    National Headquarters                        West Coast Office
1620 L Street NW, Suite 630, Washington DC  20036    475 14th Street, Suite 1230, Oakland CA  94612
(202) 797-8600 phone • (202) 232-7203 fax        (510) 622-8150 phone • (510) 622-8155 fax

Clean Air Act Sixty-Day Notice Letter: West Elk Mine
December 17, 2019
Page 14 of 14


Mail Code 8RA
Denver, CO 80202-1129
*USPS Certified Mail # 7018 1130 0000 6779 1397*

U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001
*USPS Certified Mail # 7018 1130 0000 6779 1403*

Honorable, Jared Polis
Governor of Colorado
State Capitol Building
200 East Colfax Ave., Room 136
Denver, Colorado 80203
*USPS Certified Mail # 7018 1130 0000 6779 1410*

Jill Hunsaker Ryan
Executive Director
Colorado Department of Public Health and Environment
4300 Cherry Creek Drive South
Denver, CO 80246
*USPS Certified Mail # 7018 1130 0000 6779 1427*

Garry Kaufman, Director
Air Pollution Control Division
Colorado Department of Public Health and Environment
4300 Cherry Creek Drive South
Denver, CO 80246
*USPS Certified Mail # 7018 1130 0000 6779 1434*

publicjustice.net

National Headquarters
1620 L Street NW, Suite 630, Washington DC  20036
(202) 797-8600 phone • (202) 232-7203 fax

West Coast Office
475 14th Street, Suite 1230, Oakland CA  94612
(510) 622-8150 phone • (510) 622-8155 fax